Morgan MERRY, Plaintiff,

v.

A. SULKA & COMPANY,
LTD., Defendant.

No. 95 C 6179.

United States District Court,
N.D.Illinois,
Eastern Division.

Feb. 7, 1997.

David A. Beck, Ronald A. Orner, Norton Wasserman and Sanja Djukic of Orner & Wasserman, Chicago, IL, for Plaintiff.

Timothy A. Nelsen, John K. Lyons and Tiffanie N. Cason of Skadden, Arps, Slate, Meagher & Flom, Chicago, IL; Julie B. Carlin–Sasaki of Skadden, Arps, Slate, Meagher & Flom, New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Morgan Merry ("Merry") has sued A. Sulka & Company, Ltd. ("Sulka"), asserting that Sulka violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12117,[1] by discriminating against him because of his diagnosed learning disability of dyslexia. Sulka now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56. Merry and Sulka have respectively complied with this District Court's General Rule ("GR") 12(M)

and 12(N),[2] and the motion is fully briefed and ready for decision. For the reasons stated in this memorandum opinion and order, Sulka's motion is denied.

### Summary Judgment Standards

Familiar Rule 56 principles impose on Sulka the burden of establishing both the lack of a genuine issue of material fact and that it is entitled to a judgment as a matter of law (*Celotex v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). Summary judgment is appropriate if the record reveals that no reasonable jury could find for Merry on his claim. For that purpose the evidence must be "construed as favorably to [Merry] as reason and the record permit" (*Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 272 (7th Cir.1996)). Thus this Court will draw inferences in the light most favorable to non-movant Merry, but it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there).

What follows in the *Background* section is a factual statement drawn from the parties' submissions, with any differences between them resolved in Merry's favor. Facts that fit better into the substantive legal discussion will be included later in this opinion.

### Background

Sulka is a retail establishment in the business of selling luxury men's apparel (S.12(M) ¶ 2). On August 25, 1993 Merry was hired as a sales associate for Sulka's Chicago store (S.12(M) ¶ 1). Though Merry's chief duty was the in-store sale of Sulka's products

---

**1.** Further ADA citations will take the form "Section—," referring to the Title 42 numbering rather than to the ADA's internal numbering. Pertinent regulations from 29 C.F.R. are cited "Reg. § —."

**2.** This District Court has designed GR 12 to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes. GR 12(M) requires a Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in

support of those facts. Then GR 12(N) requires the nonmoving party to respond point by point, with citations to the record in support of (1) any claimed disputes as to the movant's version of the facts and (2) any additional facts that the movant chooses to assert. Sulka's statement is cited "S. 12(M) ¶ —," with its response to Merry's statement of supplemental facts cited "S. 12(M) R. ¶ —." Merry's responses and statement of supplemental facts are respectively cited "M. 12(N) ¶ —" and "M. 12(N) Supp. ¶ —."

(Merry 7/19 Dep. 95 [3]), the job requirements also included staying in contact with customers through telephone calls and letters, filling out sales slips, doing inventory, being as well-groomed and well-dressed as possible, having a positive attitude toward work, getting along with co-workers and being honest (S.12(M) ¶ 3).

Merry had been diagnosed as dyslexic before obtaining his employment with Sulka (M.12(N) Supp. ¶ 1). Merry told Joseph Barlow ("Barlow"), the General Manager of Sulka's Chicago store, of that condition when he interviewed for the Sulka job (Merry's Interrog. Ans. 2). Merry later told Daniel Nack ("Nack"), Barlow's May 1994 replacement as General Manager, about his disability on three separate occasions of his disability (*id.*).

Merry's dyslexia was relevant to several aspects of the sales associate position. For one, Sulka is apparently unique among men's retailers in that sales checks are filled out completely by hand. While other clothing stores might use point of sale computer terminals for customer transactions, Sulka requires its sales associates to make careful handwritten notations of the name and address of the client, the payment method (including credit card number if appropriate), the employee number, a description of the item purchased, the cost of each item and the total cost of each sale (including sub-totals and sales tax) (S.12(M) ¶¶ 25–26). Additionally, Sulka expects its sales associates to maintain customer contacts with handwritten thank-you notes (Merry 7/19 Dep. 407; Merry Aff. ¶ 14). Merry's condition often made it difficult for him to complete those tasks successfully without assistance (S.12(M) ¶ 31; Merry 7/19 Dep. 407).

3. Merry's June 25, 1996 deposition was continued telephonically (by order of this Court) on July 19 and 20, 1996. Citation to the June 25 deposition will take the form "Merry 6/25 Dep.—," while the continued telephonic deposition of July 19 and 20 will be cited "Merry 7/19 Dep.—."

4. Failure to achieve sales goals would of course pose real difficulty as a criterion if this Court's function were to assess the substantive validity of an employer's decision. Thus Merry's 1994 sales were just under $233,000, as against a $250,000 goal—and the stub period during 1995, when the

Merry worked at Sulka's Chicago store for nearly two years. During that period Merry received three formal performance reviews (M.12(N) ¶¶ 6, 9, 15). With one exception—the month of December 1994—Merry never achieved his specified sales goals. Merry received no commissions or bonuses for 1993 or 1994, and he was the store's lowest performer against his goals during his final months at Sulka in 1995 (S.12(M) ¶ 16).[4] Merry was reprimanded numerous times during his time at Sulka for incidents reflecting lack of respect for his managers, his co-workers and their property (S.12(M) ¶¶ 9, 10, 14, 15, 19, 21, 22, 23), and he was never promoted (Merry Aff. ¶ 13). After discussing Merry's situation with advisors in Sulka's New York office (Nack Dep. 37), Nack terminated Merry's employment with Sulka on May 8, 1995 (S.12(M) ¶ 24).

On June 8, 1995 Merry filed an employment discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). EEOC issued a right-to-sue letter on August 31, 1995, and this timely suit followed on October 25, 1995.

## Positions of the Parties

Merry claims that Sulka violated ADA by refusing to furnish him with accommodations to which he was legally entitled and then terminating him as a result of his proper request for reasonable accommodation. Sulka sets out three grounds in support of its attempt to prevail via summary judgment:

1. It claims that Merry's dyslexia is not a "disability" as that term is defined for ADA purposes, so that Merry is not entitled to relief under ADA.

tensions between Merry and Sulka had approached and then reached crisis proportions, would not be probative if Merry were right about Sulka's failure to do what ADA required. Nothing in the record explains how Sulka sets its goals, so that any objective evaluation of this area of evidence is necessary beyond this Court's ken. But this Court is well aware that it does not serve as a super-personnel department, and it would perforce credit Sulka's perspective on this score *if* Sulka were to prevail on the other issues discussed in this opinion.

2. It also contends that in any event Merry was accommodated in numerous ways in a manner sufficient to satisfy any obligation Sulka may have had under ADA.

3. Finally it asserts that Merry was discharged for a legitimate nondiscriminatory reason, thereby negating an essential element for Merry's discrimination charge under ADA.

This opinion will consider each of these arguments in turn.

### Dyslexia as a Disability Under ADA

Section 12112(a) sets out ADA's general prohibition against discrimination:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

For that purpose Reg. § 1630.2(g) defines "disability" with respect to an individual as:

(1) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(2) A record of such an impairment; or

(3) Being regarded as having such an impairment.

Merry lays claim to a disability under only the first of those criteria, so this opinion will consider the issue in that sense alone.

For its part, Sulka does not dispute that dyslexia is an "impairment" for ADA purposes (Sulka Mem. 9),[5] but not every "impairment" is necessarily an ADA "disability" (*Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir.1995)). To satisfy that latter standard, Reg. § 1630.2(g)(1) requires that the impairment "substantially limits one or more ... major life activities."

Although ADA itself does not define "substantially limits" or "major life activity," the Regulations provide guidance. "Major Life Activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working" (Reg. § 1630.2(i)).[6] And under Reg. § 1630.2(j)(1) "substantially limits" describes a person who is:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

Finally, in any determination whether an individual is substantially limited in a major life activity, the following three factors are to be considered (Reg. § 1630.2(j)(2)):

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

Although other federal courts have generally found dyslexia to constitute a "disability" under ADA (see, e.g., *Illingworth v. Nestle U.S.A. Inc.*, 926 F.Supp. 482, 488 (D.N.J.1996), collecting cases), no per se rule requires such a finding. Rather the determination of whether or not a person has an ADA "disability" is to be made on an individualized case-by-case basis (*Byrne v. Board of Educ.*, 979 F.2d 560, 565 (7th Cir.1992)).[7] Interpretive Guidance § 1630.2(j) states:

5. Reg. § 1630.2(h)(2) defines "physical or mental impairment" to be "Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." Further, Interpretive Guidance on Title I of the ADA, 29 C.F.R. Part 1630 App. (hereafter cited "Interpretive Guidance") § 1630.2(j) says unequivocally that "an individual who is unable to read because of dyslexia would be an individual with a disability

because dyslexia, a learning disability, is an impairment."

6. Interpretive Guidance § 1630.2(i) expressly states that the just-quoted list is not exhaustive.

7. Although *Byrne* was technically decided under the Rehabilitation Act of 1973, 29 U.S.C. § 794, that holding applies here. As Interpretive Guidance § 1630.2(g) states:

The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual. Some impairments may be disabling for particular individuals but not for others, depending on the stage of the disease or disorder, the presence of other impairments that combine to make the impairment disabling or any number of other factors.

Quite clearly that determination involves a fact-intensive inquiry. Hence summary judgment for Sulka is inappropriate unless, based on the evidence presented, reasonable jurors could conclude only that Merry was not "substantially limited" in one or more "major life activities" within ADA's meaning (*Byrne*, 979 F.2d at 565–66; *Katz v. City Metal Co.*, 87 F.3d 26, 32 (1st Cir.1996)).

▇ In light of the record evidence, there are plainly material issues of fact left for jury resolution. It is quite true, as Sulka argues, that Merry has done well for himself despite his diagnosed learning disability of dyslexia. Not only is he able to read and write "as a general statement" (Merry 6/25 Dep. 210), but he has demonstrated mastery of those skills in certain contexts. For example, with the assistance of a computer and calculator Merry graduated early from the four year liberal arts program at Curry College with a 3.0 grade point average (S.12(M) ¶ 33; M. 12(N) Supp. ¶¶ 13–14). Further, Merry generally handles daily life activities such as making phone calls, using ATM machines and paying bills (Merry 6/25 Dep. 282, 286, 289). Finally, Merry has been successfully employed in sales and operations at a number of other men's clothing stores, including the Andover Shop in Boston and Dunhill in Chicago and New York. (S.12(M) ¶¶ 34–35).

But the record also shows that Merry's dyslexia does impair his ability to some degree in the "major life activities" of "performing manual tasks," "seeing" and "learning" (Reg. § 1630.2(i)).[8] That is, while Merry's dyslexia does not *entirely* prevent him from reading and writing, his learning disability does present general limitations as to numerical, reading and writing tasks (S.12(M) R. ¶ 2). Merry's performance on a series of psychological tests over the last two decades evidences his general impairments (S.12(M) R. ¶¶ 4–6), as does his inability to handle many daily activities effectively. Thus Merry cannot accurately calculate simple arithmetic figures (such as change due and tip amounts) (Merry 6/25 Dep. 286; M. 12(N) Supp. ¶ 10), he often reverses digits in telephone numbers (Merry 6/25 Dep. 282), he cannot follow cooking recipes (M.12(N) Supp. ¶ 11) and he skims rather than reads magazines because reading is such a difficult task for him (M.12(N) Supp. ¶ 12). Further, the limitations that Merry suffers from dyslexia tend to worsen under stressing factors such as the speed with which he is asked to perform a task or his physical fatigue (S.12(M) R. ¶ 2).

In sum, despite Merry's several academic and professional accomplishments, it is apparent that his numerical, reading and writing skills are impaired by his dyslexia. Surely a jury could reasonably conclude that Merry is substantially limited, vis-a-vis the average person in the general population (Reg. § 1630.2(j)(1)), in the performance of major life activities. Hence summary judgment for Sulka is inappropriate on the

---

Congress adopted the definition of this term [disability] from the Rehabilitation definition of the term "individual with handicaps." By so doing, Congress intended that the relevant caselaw developed under the Rehabilitation Act be generally applicable to the term "disability" as used in the ADA.

**8.** Because this opinion finds that material issues of fact exist as to whether Merry is substantially limited with regard to each of the three "major life activities" listed in the text, it does not go on to address the further issue of whether Merry is substantially limited as to the life activity of "working." Interpretive Guidance § 1630.2(j) specifies:

If an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered. If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working.

threshold determination of whether Merry has an ADA "disability."

### Was Merry Provided With Reasonable Accommodations?

■ Under Section 12112(b)(5)(A) an employer is found to "discriminate" for ADA purposes by reason of its:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity....

In that regard Reg. § 1630.2(*o*)(1) defines the term "reasonable accommodation" to include:

> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or

> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

Section 12111(9) provides that a "reasonable accommodation" may include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

Ultimately the reasonable accommodation required by ADA is one that provides the disabled employee with an "equal employment opportunity"—that is, "an opportunity to attain the same level of performance, or to enjoy the same level of benefits and privileges of employment as are available to the average similarly situated employee without a disability" (Interpretive Guidance § 1630.9).

■ Initially an employee must inform his or her employer of a disability before any potential for ADA liability is triggered (*Hunt–Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1012 (7th Cir. 1997)). "Once a disability has been summoned to the fore," however, the employer and employee share the burden of determining what accommodations are appropriate (*id.*). Reg. § 1630.2(*o*)(3) provides:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

■ As those standards make apparent, the framework for determining what constitutes a "reasonable accommodation" is quite flexible. As *Feliberty v. Kemper Corp.*, 98 F.3d 274, 280 (7th Cir.1996) recently stated:

> [R]easonableness does not depend solely on effectiveness or timeliness; in some circumstances, an accommodation can be reasonable even if it does not work as well as expected or if it takes a while to take effect.

Ultimately whether an employer's accommodations are judged reasonable turns on whether the employer has made "a good faith effort to assess the employee's needs and to respond to them" (*id.*). That determination involves the careful resolution of issues of fact (*McWright v. Alexander*, 982 F.2d 222, 227 (7th Cir.1992)). Summary judgment is appropriate, then, only if a reasonable jury must conclude that the employer has provided reasonable accommodations (*Feliberty*, 98 F.3d at 280; *McGregor v. Louisiana State Univ. Bd. of Supervisors*, 3 F.3d 850, 855 (5th Cir.1993)).

At the outset Merry's position that he gave Sulka prior notice of his dyslexia must be credited despite the dispute between the parties on that score:

1. Nack testified that he was unaware of Merry's dyslexia until the filing of the present lawsuit, and that Merry actually denied being dyslexic in November 1994 (Nack Dep. 15–16).

2. As already stated, Merry insists that he informed Barlow of his dyslexia when interviewing, and that he also told Nack of his condition on three separate occasions between October 1994 and January 1995 (Merry's Interrog. Ans. 2).

There is also no question for current purposes that Merry made requests for specific accommodations. Due to the difficulty he faced in transcribing long series of numbers, Merry asked for a credit card imprinter to assist him in recording account numbers on sales checks and receipts (S.12(M) ¶ 31; Nack Dep. 15). Limitations with writing and math led Merry to request accommodation for his responsibilities of handwritten thank-you notes and inventory (Merry 7/19 Dep. 407). It is evident that Merry's difficulties in those areas did not go unnoticed, for he was repeatedly criticized by Barlow and Nack for not properly writing sales checks or sending handwritten thank-you notes to customers (Merry Aff. ¶ 14).

Nonetheless Sulka argues that Merry was reasonably accommodated in any event. It submits four accommodations made available to Merry during his term of employment:

1. On Merry's request Nack ordered an imprinter in early 1995 for Sulka sales associates to use when recording credit card numbers on customer sales checks (Sulka Mem. 19; S. 12(M) ¶ 32).

2. Sulka management was understanding about the difficulty that Merry faced in properly completing sales checks. Merry was not chastised by his Sulka managers, but merely encouraged to try harder (Sulka Mem. 19; Merry 7/19 Dep. 243).

3. Nack and other sales associates assisted Merry in completing customer sales checks. In some cases other Sulka employees completed Merry's sales checks entirely (Sulka Mem. 20; S. 12(M) ¶ 29).

4. When an imprinter was not available, Merry was permitted to record credit card information by rubbing a sales check over the credit card with a pen (Sulka Mem. 20; S. 12(M) ¶ 30).

■ If those matters are scrutinized in a light most favorable to Merry, however, they do not call for the conclusion that Merry was reasonably accommodated as a matter of law. Although Merry admits that a credit card imprinter was eventually made available to him, he suggests that it was permanently removed after being in his station for at most one month (Merry Mem. 13; M. 12(N) ¶ 32). Further, Sulka concedes that although Merry requested the imprinter when he was hired in August 1993 (Sulka Mem. 18), the imprinter was not purchased until January 1995. As for the assistance that Merry received in completing sales checks, he correctly points out that Sulka's careful review of their records has turned up only 15 examples of such assistance in Merry's nearly two years of employment (M.12(M) ¶ 29). And Merry reports being "repeatedly criticized" by Barlow and Nack for failure to properly write out sale checks (Merry Aff. ¶ 14). Finally, the "rubbing" method that Merry was permitted to use for recording credit card information is not necessarily a reasonable accommodation, for it created more smudging on the sales slips (Merry 7/19 Dep. 276) and embarrassed Merry in front of his customers (Merry Mem. 14).

In sum, issues of material fact exist as to whether Merry was provided "reasonable accommodation" for ADA purposes. Not only is each of Sulka's alleged accommodations subject to dispute based on record evidence, but Sulka does not appear ever to have addressed Merry's requested accommodation in the areas of handwritten thank-you notes or inventory. Hence this Court cannot conclude as a matter of law either that Sulka made a "good faith effort" to accommodate Merry (*Feliberty*, 98 F.3d at 280) or that Merry was provided an "equal employment opportunity" relative to other Sulka employees (Interpretive Guidance § 1630.9).

### Was Merry Discharged for an Improper Purpose?

■ Sulka's final argument on its Rule 56 motion is that Merry was discharged for a

proper nondiscriminatory reason: Merry failed to meet Sulka's legitimate job expectations (Sulka Mem. 15). In that regard Sulka contends that Merry has failed to demonstrate an essential element of a prima facie case under the burden-shifting approach set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as applied to ADA cases in *DeLuca v. Winer Industries, Inc.,* 53 F.3d 793, 797 (7th Cir.1995).

In view of the more recent decision in *Bultemeyer v. Fort Wayne Community Sch.,* 100 F.3d 1281, 1283 (7th Cir.1996), Sulka has improperly framed its argument in *McDonnell Douglas* terms. Merry has not stated a claim for disparate treatment, in which case he would have to rely on evidence that other non-disabled employees were treated more favorably to prove indirectly (under the *McDonnell Douglas* method) that Sulka had fired him because of his disability. Instead Merry has stated a direct case under the specific provisions of Section 12112(b)(5) that define the term "discriminate" (*Bultemeyer,* 100 F.3d at 1283).

Despite its inaccurate framework, Sulka's argument that Merry was terminated for a legitimate business reason is still quite relevant. Although our Court of Appeals has not yet had the occasion to identify the precise elements of a direct ADA claim (*Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 933 n. 5 (7th Cir.1995)), other Courts of Appeals have done so. Thus *White v. York Int'l Corp.,* 45 F.3d 357, 360–61 (10th Cir.1995) (collecting cases) held that a plaintiff must establish these elements to state a prima facie case under ADA:

(1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability.

That third element—that the employer acted "because of" the employee's disability—is properly targeted by Sulka's assertion of a legitimate business motive. For as *Siefken v. Village of Arlington Heights,* 65 F.3d 664, 666 (7th Cir.1995) has put it:

The ADA does not, however, erect an impenetrable barrier around the disabled employee, preventing the employer from taking any employment actions vis-a-vis the employee.

If Merry was in fact terminated for reasons unrelated to his disability, he would have no ADA-based action against Sulka for that termination (cf. *Despears v. Milwaukee County,* 63 F.3d 635, 636–37 (7th Cir.1995)).

In this instance the record contains a detailed account of Merry's troubles at Sulka from almost the very beginning of his employment. This opinion has already adverted to his consistent failures to meet his sales targets. And as for the earlier reference to his reported lack of respect for co-workers and managers and his disregard of company rules, Sulka identifies a number of situations leading up to Merry's termination:

1. On April 22, 1994 Merry left the store with inadequate staffing by leaving ten minutes early for an assigned break (S.12(M) ¶ 8).

2. Before Merry's August 1994 review he "told [another] employee off" when offered assistance with rearranging the tie wall (S.12(M) ¶ 10).

3. After the August 1994 review Merry violated Sulka policy by grabbing another sales associate in the middle of the sales floor and kissing her (S.12(M) ¶ 12).

4. On January 28, 1995 Merry attempted to give another sales associate a phone message while that associate was working with a customer. When that associate told Merry that he did not wish to be interrupted, Merry replied either "screw you" or "fuck you" (S.12(M) ¶ 14).

5. In March 1995 Merry disobeyed direct instructions from Nack to place a customer shirt order through the custom department. After disagreeing with Nack over the appropriate order, Merry ordered a less expensive "made-to-measure" shift rather than a "custom-made" shirt. That order was later rejected due to the customer's requirements (S.12(M) ¶ 19).

6. Despite Nack's instructions to the contrary, Merry used the industrial steam iron in the alteration room reserved for

tailors. Merry left it on and nearly set fire to the store (S.12(M) ¶ 20).

In early April 1995 Nack met with Merry to discuss his performance, to suggest that promotional opportunities at Sulka were unlikely and to indicate that Merry should consider employment elsewhere (S.12(M) ¶ 21). In mid to late April 1995 Merry was reported to have looked through another sales associate's personal belongings and to have announced her salary to other Sulka employees (S.12(M) ¶ 22). After investigating that incident and discussing Merry's situation with advisors in Sulka's New York office (Nack Dep. 37), Nack terminated Merry's employment on May 8, 1995 (S.12(M) ¶ 24). Based on Nack's handwritten notes from his May 8 meeting with Merry, Sulka now argues that each of the above-identified incidents, "combined with [Merry's] poor sales performance, negative attitude, lack of motivation, and confrontational manner" led to Merry's termination (S.12(M) ¶ 24).

In response to Sulka's documentation of Merry's employment problems, Merry has submitted an affidavit (completed after his extensive deposition testimony) in which he summarily denies his involvement in many of those claimed incidents (Merry Aff. ¶¶ 8–11). Sulka correctly retorts that simple conclusory denials, made without any factual corroboration, are generally insufficient to create a genuine issue of material fact (*Cusson–Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir. 1992)). And in light of the detailed record evidence of Merry's troubled employment, Merry's testimonial self-evaluation of his performance as adequate would not alone suffice to prevent summary judgment (*Denisi v. Dominick's Finer Foods, Inc.,* 99 F.3d 860, 865 (7th Cir.1996)).

But Merry's case does not rely solely on those conclusory affidavit statements. Issues of fact exist as to several of the reported incidents upon which Merry's termination was based. Thus Merry's early break on April 22, 1994 (leaving the store short-hand-ed) might be explained by a note giving him permission to leave—a note that Barlow inadvertently overlooked (M.12(N) ¶ 8). Additionally, it is not clear that Nack ever gave Merry specific instructions about the March 1995 custom shirt order or the employees' use of the tailors' store steam iron (M.12(N) ¶¶ 19, 20).

Perhaps more significantly for ADA purposes, issues of fact exist as to whether Merry's "poor sales performance, negative attitude, [and] lack of motivation" (S.12(M) ¶ 24) were directly attributable to Sulka's failure to provide "reasonable accommodation." Here the record abounds with evidence that development of a client base was essential to the success of a Sulka sales associate.[9] And Sulka's alleged failure to provide certain requested accommodations might have hindered Merry's client development. Customers frequently complained when Merry was unable to fill out a sales check quickly (Merry 7/19 Dep. 261–62), and Merry was embarrassed in front of customers when forced to use the "rubbing" method to record credit card information (Merry 7/19 Dep. 276; Merry Mem. 14). Merry's difficulty with written thank-you notes might also have limited consistent customer contact (Merry 7/19 Dep. 407).

This case is scarcely free from difficulty. It is entirely possible that if the evidence presented on the current motion were to be tendered at trial, this Court might still act favorably on a Sulka motion for a judgment as a matter of law under Rule 50(a)—or if the full trial evidence were presented to a factfinding jury and the jury were to render a verdict in Merry's favor, a Sulka Rule 50(b) motion might then be granted. And it is of course true that the Rule 56 standard coincides with that applicable under Rule 50 (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)). But any such ruling would necessarily be predicated on the live testimony of witnesses (and hence on the resolution of their credibility), as contrasted

---

9. For example, Nack remarked on Merry's February 12, 1995 performance review that as Merry's "client base improves, so should his sales" (Sulka Ex. J). Additionally, Merry testified that one of his primary duties was to "[s]tay in con-

tact with customers" (Merry 7/19 Dep. 95), and Nack suggested that sales associates felt a "proprietary" interest in certain customers (Nack Dep. 41).

with the current need to act on a paper record alone. Accordingly, though the question is close, Merry's claim cannot be cut off at the present time.

In sum, it cannot now be determined as a matter of law that Merry was not discharged "because of" his disability. Factual issues exist both as to a number of the reported incidents upon which Sulka justifies its business motive for termination and as to whether Sulka's failure to provide reasonable accommodations itself is a substantial explanation for Merry's poor performance. Although those factual disputes do not exhaust the reasons advanced by Sulka, they still leave a question as to whether the residual problems would have led to (and sufficed for) a decision to terminate Merry. Hence summary judgment is inappropriate on the basis of Sulka's claimed proper non-discriminatory motive for discharge.

*Conclusion*

Issues of material fact exist as to each of the three bases for summary judgment proffered by Sulka in this motion. Again even though Merry's likelihood of success may appear marginal, it cannot now be held as a matter of law (1) that Merry does not have a "disabililty" as that term is defined in ADA, (2) that Sulka provided "reasonable accommodation" for Merry's disability or (3) that Merry was not discharged "because of" his disability in the ADA sense. Summary judgment for Sulka is therefore inappropriate, and its motion is denied. This action is set for a status hearing at 8:45 a.m. February 20, 1997.