**Donna HENDRICKS–ROBINSON, Penny Moore, Teresa D. Westlake, and Cynthia Peters, Plaintiffs,**

v.

**EXCEL CORPORATION, Defendant.**

No. 94–3156.

United States District Court, C.D. Illinois, Springfield Division.

Aug. 4, 1997.

Michael B. Erp, Irving M. Friedman, Martha A. Garcia, Chicago, IL, John P. Nicoara, Peoria, IL, for plaintiffs.

Timothy A. Wolfe, Joseph E. Tilson, Brett G. Rawitz, J. Stuart Garbutt, Chicago, IL, for defendant.

## OPINION

RICHARD MILLS, District Judge:

An ADA class action.

Cross-motions for summary judgment.

Did Defendant's medical layoff policy violate the ADA?

No.

## I. FACTUAL BACKGROUND

In June of 1987, the Excel Corporation ("Excel") purchased a pork slaughtering plant in Beardstown, Illinois, from the Oscar Mayer Corporation. Hogs are delivered to the plant where they are slaughtered, processed, and shipped to customers.

Since 1993, Excel has employed between 1,600 and 1,800 employees at its Beardstown plant. The production employees (who comprise approximately 85% of the plant's total labor force) are represented by the United Food and Commercial Workers Union, Local 431, AFL–CIO ("Union"). Since 1991, Excel and the Union have maintained two Collective Bargaining Agreements ("CBA") which cover the production employees. The first agreement ran from 1991 to 1994, and the successor agreement runs from 1995 to 1999.

Production work in a meatpacking plant involves hard, heavy, and repetitive work. Accordingly, it is impossible to design meatpacking jobs to suit every individual's needs. Because the plant prepares meat for human consumption, it is subject to stringent sanitation and public health regulations. The work must be performed quickly, precisely, and often under uncomfortable conditions. Additionally, because the work involves butchering, cutting, and packaging the meat of animals of various sizes and shapes, it is impossible to mechanize many aspects of the work. Consequently, meatpacking plants traditionally have experienced higher than average rates of worker injuries. Excel is no exception.

In order to reduce employee injuries, Excel launched a comprehensive Ergonomics and Medical Management Program in 1989. Accordingly, Excel retained the assistance of an ergonomics consulting firm to assist in setting up the program and to provide ergonomics training to its supervisors, medical staff, ergonomics monitors, and certain other employees. As part of this program, Excel's ergonomics team cataloged the physical requirements of each production job at the plant on Medical Management Job Analysis ("MMJA") forms. Excel's nursing staff used the MMJA forms in determining whether a permanently restricted employee could perform the essential functions of a vacant production position. The nursing staff also consulted these MMJA forms in determining whether to place an injured employee on permanent medical layoff status.

Prior to 1991, Excel provided its employees who were injured in the plant with restricted or light duty jobs.[1] These light duty jobs were not subject to the bidding procedure outlined in the seniority provision of the CBA. Rather, Excel's light duty jobs could be assigned directly without regard to seniority.

However, in October 1991, Excel changed its policy and no longer assigned permanently restricted employees to light duty positions. Excel's new policy was to reserve the light duty jobs for temporarily restricted employees who would labor in the light duty positions until they were able to return to their former positions. As for employees with permanent medical restrictions, Excel reviewed their restrictions to see if the employee could perform the physical requirements of the job which they had held prior to receiving any medical restriction or if they could perform the essential functions of any other vacant production position in the plant. If they could not, Excel placed these permanently restricted employees on medical layoff status.

Prior to placing a permanently restricted employee on medical layoff, an employee who was injured was referred to Excel's nursing staff. After the injured employee was treat-

---

1. The CBA lists certain jobs as being "light duty jobs."

ed and evaluated by Excel's nursing staff and/or his own physician, Excel's nursing staff compared the employee's specific medical restrictions, if any, with the physical requirements of his particular job *via* the MMJA forms, input from other employees, and the nurse's own knowledge and experience of the physical requirements of the position. If the injured employee's restrictions were such that he was unable to return to his position, a member of the nursing department met with the employee to discuss possible modifications and/or accommodations which would allow him to return to his position. Excel also offered the injured employee a tour of the plant to familiarize the employee with other jobs which the employee might be able to perform. If the employee could not perform the essential functions of his former position or of any other vacant production position, with or without any reasonable modifications or accommodations, the employee was given a temporary, light duty position.

Once an injured employee who had been working in a light duty position had reached his maximum medical improvement, Excel's nursing department again met with the injured employee to discuss whether he could return to his former position or to any other vacant production position in the plant. If he could not, the permanently restricted employee was placed on medical layoff.

While on medical layoff, the employee was free to bid on any vacant production and/or non-production position. In addition, Excel automatically bid permanently restricted employees on all vacant production positions. If the permanently restricted employee was the most senior applicant and was able to perform the essential functions of the position, the employee was removed from medical layoff status and was awarded the position.

However, after a permanently restricted employee had been on medical layoff for a period of twelve months, Excel terminated that employee based upon Article XIII, § 7E of the CBA.[2] Plaintiffs are all Excel employ-

ees at the Beardstown plant who Excel perceives to have permanent medical restrictions and who were placed on medical layoff pursuant to Excel's medical layoff policy regarding permanent restrictions and who have been or will be terminated allegedly pursuant to Article XIII, Section 7E of the CBA. Plaintiffs claim that Excel's medical layoff policy violates the Americans with Disabilities Act ("ADA"). 42 U.S.C. § 12101 *et seq.*

## II. PROCEDURAL BACKGROUND

From the outset, Plaintiffs sought to litigate this case as a class action. Initially, the Court denied Plaintiffs' request to certify the class. However, upon a motion to reconsider, the Court reversed its prior ruling and certified the class. The Court decided to certify the class after Plaintiffs represented to the Court that they were not purporting to support their allegations of discrimination by focusing upon the facts surrounding each Plaintiff's individual claims. Rather, Plaintiffs asserted that they were claiming that Defendant's medical layoff policy itself violated the ADA.

■ Accordingly, in order for Plaintiffs to succeed as a class, they must show either that "(1) Excel's medical layoff policy on its face is violative of the ADA; or (2) although the policy on its face may not violate the ADA, a common general procedure (*i.e.,* a procedure not apparent on the face of the policy) to its employees is violative of the ADA." *Hendricks–Robinson v. Excel Corp.,* 164 F.R.D. 667, 670 (C.D.Ill.1996). Plaintiffs may not rely upon their individualized injuries.

## III. STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

---

2. Article XIII, § 7E of the 1991–1994 CBA stated that an employee could be terminated if he were "[a]bsent from work for any reason for a period of twelve (12) months, unless extended by the Human Resources Manager." Article XIII, § 7E of the 1995–1999 CBA extended the time period to eighteen months.

material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *see Ruiz–Rivera v. Moyer*, 70 F.3d 498, 500–01 (7th Cir.1995). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987).

## IV. ANALYSIS

Although the Seventh Circuit has not expressly identified the precise elements necessary to maintain a cause of action under the ADA,[3] other Courts of Appeals have done so.[4] However, in *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 552 (7th Cir. 1996), the Seventh Circuit cited *D'Amico v. New York State Bd. of Law Examiners*, 813 F.Supp. 217 (W.D.N.Y.1993), as an example of a case which listed the elements necessary to establish an ADA claim. The *D'Amico* court stated that in order "to succeed on a

claim under the ADA, plaintiff must show (1) that she is disabled, (2) that her requests for accommodations are reasonable, and (3) that those requests have been denied." *Id.* at 221.

Excel has not challenged Plaintiffs' assertions that they are disabled as that term is defined in the ADA.[5] Rather, Plaintiffs and Excel disagree as to whether Plaintiffs' requests for accommodations are reasonable and whether those requests have been denied.[6]

Plaintiffs argue that Excel's medical layoff and termination policy violates the ADA and/or that Excel's procedures for applying said policy violate the ADA. Specifically, Plaintiffs claim that Excel systematically laid off its physically restricted employees without making reasonable accommodations for the known physical limitations of otherwise qualified individuals with disabilities in violation of the ADA. Plaintiffs assert that Excel's policy and procedures violate the ADA in four separate respects.

### A. LIGHT DUTY JOBS

■ Plaintiffs argue that Excel violated the ADA by removing medically restricted employees from light duty positions which they could perform. Plaintiffs assert that the light duty positions were a reasonable accommodation under the ADA, and therefore, they should not have been forced to relinquish those positions after it was determined that they were permanently restricted. Finally, Plaintiffs state that these light duty jobs were not temporary positions but were permanent, light duty positions which they were capable of performing as evi-

---

3. *Merry v. A. Sulka & Co., Ltd.*, 953 F.Supp. 922, 929 (N.D.Ill.1997).

4. *E.g. White v. York Int'l Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995); *Mason v. Frank*, 32 F.3d 315, 318–19 (8th Cir.1994); *Tyndall v. Nat'l Educ. Ctrs., Inc. of California*, 31 F.3d 209, 212 (4th Cir.1994); *Chandler v. City of Dallas*, 2 F.3d 1385, 1390 (5th Cir.1993); *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C.Cir.1993); *Gilbert v. Frank*, 949 F.2d 637, 640–42 (2nd Cir.1991); *Lucero v. Hart*, 915 F.2d 1367, 1371 (9th Cir.1990).

5. "Disability means, with respect to an individual—(1) A physical or mental impairment that

substantially limits one or more of the major life activities of such individual; (2) A record of such an impairment; or (3) being regarded as having such an impairment." 29 C.F.R. § 1630.2(g).

6. It is important to remember that this case has been brought before the Court as a class action. Thus, the Court must consider Plaintiffs' claims as a class without delving into an individual inquiry of the facts pertaining to each Plaintiff's individual claims. *See Hendricks–Robinson*, 164 F.R.D. at 670.

denced by the fact that they did, in fact, complete the essential functions of those positions until they were placed on medical layoff. Thus, Plaintiffs claim that the light duty jobs were a reasonable accommodation for their disabilities and that Excel violated the ADA when it removed them from those positions.

Excel argues that it had no duty under the ADA to create any new positions or to convert temporary positions into permanent jobs in order to make reasonable accommodations for Plaintiffs. Excel states that an employer may, consistent with the ADA, adopt a policy making light duty assignments temporary positions only. Excel asserts that its light duty assignments were temporary because the jobs ended when the injured employee was able to return to heavy duty work or was determined to be permanently restricted. Excel claims that there is nothing in the ADA which requires that light duty assignments be listed in the CBA or that the jobs have a certain termination date. Therefore, Excel argues that the ADA does not mandate that Plaintiffs receive an indefinite entitlement to its temporary light duty positions.

■ The Equal Employment Opportunity Commission ("EEOC") guidelines to the ADA provide that a reassignment may be considered as a reasonable accommodation to a person with a disability. 29 C.F.R. § 1630.2(*o*)(2)(ii). However, the ADA does not require an employer to promote a disabled employee, to give a disabled employee "superseniority," to give a disabled employee an occupied position (*i.e.* the ADA does not require that a disabled person be allowed to "bump" another employee out of his position), to convert a temporary position into a permanent job, or to create a new position in order to reasonably accommodate a disabled person. 29 C.F.R. pt. 1630, App. § 1630.2(*o*); *Gile v. United Airlines, Inc.,* 95 F.3d 492, 499 (7th Cir.1996); *Eckles v. Consolidated Rail Corp.,* 94 F.3d 1041, 1051 (7th Cir.1996); *White v. York Int'l Corp.,* 45 F.3d 357, 362 (10th Cir.1995); *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1114 (8th Cir.1995).

Moreover, an employer may, in compliance with the ADA, determine that a light duty position will be temporary rather than permanent and, thereby, provide those light duty positions to disabled employees on a temporary basis only. *EEOC Enforcement Guidance: Workers Compensation And The ADA,* EEOC Compliance Manual Sec. 915.002, p. 23 (Sept. 3, 1996).

In the instant case, the Court finds that the light duty jobs at Excel's plant were temporary and that the removal of Plaintiffs from those positions once it was determined that they were permanently restricted did not violate the ADA. First, the CBA clearly lists certain positions as being light duty jobs. While it may have been preferable for the CBA to have described these light duty jobs as temporary or for the CBA to have contained a certain date and time at which a disabled employee could no longer retain one of the light duty positions,[7] that omission does not mean that the jobs were not temporary.

Prior to October 1991, Excel provided workers who were injured in the plant with light duty jobs. These light duty jobs were not subject to the bidding procedures established in the CBA nor were the jobs awarded based upon seniority. After October 1991, Excel assigned injured workers to these light duty jobs while they were recovering from their injury. As long as the injured employee's medical condition continued to improve and as long as he was considered to be temporarily restricted, he could remain in the light duty position. However, once the injured employee was determined to be permanently restricted in that he could not perform the essential functions of any of the production jobs in the plant other than the essential functions of the light duty jobs, he was placed on medical layoff.

Under these circumstances, the Court finds that the light duty jobs were temporary. Although the jobs did not have an ending date, it is clear that Excel's policy set these jobs aside in order to facilitate its employees' recoveries from their injuries.

---

7. *E.g. Champ v. Baltimore County,* 884 F.Supp. 991, 999 (D.Md.1995) (light duty positions were for a maximum of 251 days); *Howell v. Michelin* *Tire Corp.,* 860 F.Supp. 1488, 1490 (M.D.Ala. 1994) (light duty positions were for a maximum of 13 weeks).

Excel's policy attempted to facilitate its employees' recoveries by allowing them to remain employed rather than placing them on medical layoff to recover at home. Once the employee was no longer medically restricted or was permanently restricted, the light duty job was no longer available to him. Thus, the position was of a temporary duration.[8]

Because Excel treated all of its light duty jobs as temporary, it was not required to make those positions permanent as a reasonable accommodation under the ADA. The Court finds this case to be substantially similar to *Nguyen v. IBP, Inc.*, 905 F.Supp. 1471 (D.Kan.1995). Like Excel's policy in the case at bar, the employer's policy in *Nguyen*

> set aside certain light-duty jobs, like the picker position, just for employees who are under medical management. Standard production requirements do not exist for these positions; supervisors simply evaluate whether the injured employee is putting forth sufficient effort considering his medical restrictions. IBP treats these light-duty jobs as temporary assignments given to injured employees during their period of recuperation. As long as the employee is still recuperating and is subject to medical restrictions, IBP will allow the employee to retain the light-duty position.

*Id.* at 1485 n. 8. Accordingly, the *Nguyen* court stated that "because [the defendant] treated as temporary all assignments to the light-duty picking position, [the plaintiff's] permanent assignment to that position is not a reasonable accommodation." *Id.* at 1485–86.

Likewise, because Excel treated its light duty positions as temporary, the ADA did not require it to provide the light duty jobs to Plaintiffs on a permanent basis. Excel's

policy allowed injured employees to remain in light duty positions for a longer period of time than if Excel's policy had limited the position to a certain amount of time.[9] Therefore, Excel's policy engaged in the type of individualized, case-by-case inquiry which is favored by the ADA rather than terminating all injured employees from their light duty positions after a certain period of time.

Second, Plaintiffs argue that Excel's policy violated the ADA because it focused on whether permanently restricted employees could perform the essential functions of heavy duty positions rather than the light duty jobs which they were performing at the time when they were placed on medical layoff. Plaintiffs assert that the relevant inquiry under the ADA regarding whether an employee can perform a job's essential functions is whether the employee can perform the essential functions of the job he was performing prior to layoff and not whether he could perform the essential functions of his position prior to his injury.

Plaintiffs rely heavily on *Valdez v. Albuquerque Pub. Schs.*, 875 F.Supp. 740 (D.N.M. 1994) and *Taylor v. Garrett*, 820 F.Supp. 933 (E.D.Pa.1993). In *Valdez*, the district court found that a disabled employee's "inability to perform the essential functions of the employment position for which he was hired does not defeat his claims under the ADA." *Valdez*, 875 F.Supp. at 747. Rather, that court stated that the focus should be on the job the plaintiff was performing prior to the alleged discrimination. *Id.* Likewise, in *Taylor*, the district court held that "when an employee *has* been offered light-duty work ... and that employee challenges the conditions of, and the reasons for his separation from, such light-duty work, the relevant inquiry must be his qualifications to perform

---

8. *See EEOC Enforcement Guidance: Workers Compensation and the ADA*, EEOC Compliance Manual § 915.002, p. 23 (Sept. 3, 1996) which in a question and answer format states:

> 29. If an employer has only temporary light duty positions, must it still provide a permanent light duty position for an employee with a disability-related occupational injury?
> No. The ADA typically does not limit an employer's ability to establish or change the content, nature, or functions of its positions. So, for example, and employer is free to deter-

mine that a light duty position will be temporary rather than permanent. Thus, if an employer provides light duty positions only on a temporary basis, it need only provide a temporary light duty position for an employee with a disability-related occupational injury.

9. As long as a temporarily restricted employee's medical condition was improving, the employee could remain in his light duty position indefinitely.

that work in which he was engaged when the alleged discrimination occurs." *Taylor*, 820 F.Supp. at 938 (emphasis in original).[10]

However, neither case addresses the issue presented here: whether permanently restricted employees are entitled to permanently retain light duty positions which have been set aside as temporary, light duty positions for temporarily restricted employees. On that issue, the Court is persuaded by *Nguyen* and *Sidaris v. Runyon*, 967 F.Supp. 1260 (M.D.Ala.1997). In *Nguyen*, the district court stated

> Indeed, it seems consistent with the ADA that an employer should not be discouraged from assigning injured employees to temporary light-duty positions during their recuperation by the risk that these temporary assignments will establish that the employer can reasonably accommodate an employee with a vacant, permanent assignment.

*Nguyen*, 905 F.Supp. at 1486.

Likewise, the district court in *Sidaris* held that an employer is not required to assign a disabled employee to a permanent, light duty position or to continue that employee's temporary, light duty assignment indefinitely even though it may have done so in the past. *Sidaris*, 967 F.Supp. at 1267–68. "To find otherwise will result in employers making no effort beyond that mandated by the Act to accommodate an employee for fear that each new accommodation will raise the standard for subsequent reasonable accommodation efforts." *Id.; see McCollough v. Atlanta Beverage Co.*, 929 F.Supp. 1489 (N.D.Ga.1996).[11]

Here, if Excel were forced as a reasonable accommodation under the ADA to provide its light duty positions on a permanent basis to its permanently restricted employees, at some point in time, all of Excel's light duty jobs would be filled by permanently restricted employees. Thus, future temporarily re-

stricted employees would no longer have the opportunity to work in a temporary, light duty position while they recuperated from their injuries but would be forced into medical layoff until they were able to return to heavy duty work. This result would violate the spirit of the ADA. *See Vande Zande v. State of Wisconsin Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir.1995) (holding that an employer who accommodates one disabled employee "must not be punished for its generosity by being deemed to have conceded the reasonableness of" such an accommodation in the future).

Accordingly, the Court finds that Excel's policy of removing permanently restricted employees from temporary, light duty positions once they were determined to be permanently restricted did not violate the Americans with Disabilities Act.

### B. PRODUCTION JOBS

■ Plaintiffs state that Excel violated the ADA by restricting the positions utilized for accommodating disabled employees to production jobs only. Plaintiffs argue that an employer may not look to a subset of its employment positions for purposes of accommodation under the ADA. Plaintiffs assert that reasonable accommodation includes reassignment to any vacant position and not simply to the equivalent vacant position as the employee held prior to his disability. Moreover, Plaintiffs state that undue hardship (which Defendant has not claimed) is the only basis for denying a qualified employee a reasonable accommodation. Plaintiffs claim that even though disabled employees asked for employment in any available position, Excel excluded non-production jobs (which numbered somewhere between 240–270 jobs) from the accommodation process and, thus, violated the ADA.

---

10. The plaintiff in *Taylor* alleged that the defendant had discriminated against him in violation of the Rehabilitation Act. 29 U.S.C. § 794(a).

11. The *McCollough* court stated that "by initially providing plaintiff with temporary light duties when he was unable to perform his regular duties, defendant treated a temporarily disabled employee in a compassionate manner that soci-

cty should encourage. Plaintiff's argument would discourage an employer from providing any stopgap measures to keep an ailing employee on the payroll while he recuperates lest such action might be construed as creating an entitlement for the employee, allowing him to claim forever that he had a right to continue on with his reduced duties." *Id.* at 1503.

Excel argues that it does consider disabled employees for non-production positions if they request consideration for such positions. Excel asserts that the ADA does not place the entire burden upon the employer to find a reasonable accommodation for a disabled employee. Rather, the disabled employee must meet the employer half-way and must take some responsibility for his own employment needs. Finally, Excel states that until a disabled employee applies for and is denied a non-production position based upon his disability, a suit complaining of discrimination is premature.

> Title 42 U.S.C. § 12111(9) states that
> [t]he term "reasonable accommodation" may include—(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, *reassignment to a vacant position*, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

(emphasis added). Accordingly, "the ADA may require an employer to reassign a disabled employee to a different position as reasonable accommodation where the employee can no longer perform the essential functions of their current position." *Gile*, 95 F.3d at 498. However, there are limits upon an employer's obligation to reassign a disabled employee as a reasonable accommodation. *Id.* at 499. For example, an employer is not obligated to provide a disabled employee with the accommodation he prefers, only with a reasonable accommodation. *Id.; Schmidt v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 342, 344–45 (7th Cir.1996). Moreover, an employer is not required to reassign a disabled employee to a position for which the employee is otherwise unqualified. *Gile*, 95 F.3d at 499; *White*, 45 F.3d at 362.

Contrary to Plaintiffs' assertions, the Court finds that Excel did not exclude non-production jobs from the accommodation process. Excel's policy was to automatically bid permanently restricted employees on vacant, production positions. These production positions accounted for approximately 85% of Excel's labor force. Plaintiffs state that Excel also should have automatically considered them for the remaining 15%, non-production jobs, and by not doing so, Excel's policy violated the ADA.

However, Excel did consider permanently restricted employees for non-production positions if they applied for such a position. In his deposition, Michael Icenogle [12] testified that medically laid off employees could apply for non-production positions. He further stated that no one ever advised permanently restricted employees that they could not be considered for non-production positions. Likewise, James Clark [13] testified at his deposition that if a disabled employee had asked to see a non-production job, he would have been shown those positions. Therefore, Excel did not limit its accommodation process to a subset of its employment opportunities.

Plaintiffs make much of the fact that vacant non-production jobs were posted for only two days. Plaintiffs assert that posting vacant positions for only two days did not provide them with adequate time and/or notice to apply for those positions. However, the CBA provided that vacant production and non-production jobs were to be posted for two days only. Therefore, disabled employees were given as much time and notice regarding vacant positions as non-disabled employees were given. A disabled employee should not be placed in a better position due to his disability. *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir.1995).

While Excel was required under the ADA to make reasonable accommodations for disabled employees, the ADA did not require it to automatically bid said employees on any of its vacant positions. "Employers cannot deny an employee alternative employment opportunities reasonably available under the

---

**12.** Michael Icenogle has been Excel's safety director since 1992.

**13.** From 1992 to 1994, James Clark was Excel's light duty coordinator. In 1994, James Clark became Excel's ergonomics coordinator.

employer's existing policies, but they are not required to find another job for an employee who is not qualified for the job he or she was doing." *Schmidt,* 89 F.3d at 344; *School Bd. of Nassau County, Florida v. Arline,* 480 U.S. 273, 289 n. 19, 107 S.Ct. 1123, 1131 n. 19, 94 L.Ed.2d 307 (1987). By giving plant tours and automatically bidding permanently restricted employees on production jobs, Excel went above and beyond what the ADA required. To penalize Excel for not automatically bidding permanently restricted employees on all non-production jobs not only violates the spirit of the ADA but discourages employers from assisting disabled employees beyond the requirements of the ADA. *Vande Zande,* 44 F.3d at 545; *Nguyen,* 905 F.Supp. at 1486; *McCollough,* 929 F.Supp. at 1503.

Accordingly, the Court finds that Excel's policy of automatically bidding disabled employees on production jobs only rather than on both production and non-productions jobs did not violate the Americans with Disabilities Act.

## C. *INTERACTIVE PROCESS*

■ Plaintiffs argue that Excel's job matching process violated the ADA. Plaintiffs assert that even though Excel based its hiring policy exclusively upon the MMJA forms, these forms do not identify the essential functions of the particular job associated with the MMJA form. Moreover, Plaintiffs assert that Excel provided no training to its nurses on the form's proper use. Finally, Plaintiffs state that Excel failed to engage in an interactive process with them in order to discover any reasonable accommodations which would enable them to remain in Excel's employ.

Excel argues that its job matching process was adequate to enable Plaintiffs to engage in a meaningful, interactive discussion regarding reasonable accommodations. Excel asserts that the MMJA forms were designed by ergonomics experts to inform job applicants of the physical tasks and strains associated with the various jobs within the plant. Furthermore, Excel states that its job matching process included such features as: (1) automatically bidding disabled employees for available production positions; (2) conducting at least two face-to-face meetings with nurses prior to medical layoff; (3) offering temporary, light duty positions; and (4) affording disabled employees the opportunity to discuss reasonable accommodations with nurses, union officials, ergonomic monitors, and fellow employees. Accordingly, Excel states that its job matching process did not violate the ADA.

■ "Once an employer knows of an employee's disability and the employee has requested reasonable accommodations, the ADA and its implementing regulations require that the parties engage in an interactive process to determine what precise accommodations are necessary." *Beck v. Univ. of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1137 (7th Cir.1996); 29 C.F.R. § 1630.2(*o*)(3); 29 C.F.R. § 1630, App. "[B]oth parties bear responsibility for determining what accommodation is necessary." *Beck,* 75 F.3d at 1135; *Bultemeyer v. Fort Wayne Community Schs.,* 100 F.3d 1281, 1285 (7th Cir.1996). The Court's task is to determine (by applying the concepts of good faith and reasonable effort to the facts of the case) which party is responsible for the breakdown in the interactive process and then to assign responsibility to that party. *Beck,* 75 F.3d at 1135–36; *Bultemeyer,* 100 F.3d at 1285–86.

In the present case, the Court finds that the responsibility lies with Plaintiffs. Excel's job matching process provided an opportunity for injured employees to engage in an informal colloquy with Excel. Excel provided plant tours at which time injured employees were free to ask questions regarding the essential functions of the various positions within the plant. Permanently restricted employees met with Excel's nurses for at least one face-to-face discussion regarding the employees' medical condition, restrictions, and accommodations. Excel also provided ergonomic monitors to discuss job requirements with injured employees.

In addition, Excel automatically bid permanently restricted employees on vacant production positions. Excel would award a vacant position to a permanently restricted employee as long as the applicant was the most senior bidder and was able to perform

the essential functions of the position. Excel provided temporary, light duty work to employees while they were on the mend. During this time, the employee was free to bid on other production positions, discuss reasonable accommodations with Defendant, and apply for non-production jobs.

Finally, Excel encouraged permanently restricted employees to call the plant at least once a week to see if they had been awarded a position. Presumably, the permanently restricted employees were free to discuss the availability of any vacant production or non-production position as well as the availability of any reasonable accommodations. Thus, Excel not only made itself available to listen to its permanently restricted employees, Excel, in good faith, used the above described procedures to engage in an interactive process to determine the feasibility of reasonable accommodations for permanently restricted employees. *Miller v. Illinois Dep't of Corrections*, 107 F.3d 483, 486 (7th Cir. 1997).

Plaintiffs argue that once they were placed on medical layoff, they were effectively cut off from the interactive process because they were locked out of the plant and were provided little if any information when they called Excel. Plaintiffs state that because Excel had all of the pertinent information, Excel is responsible for the breakdown in the interactive process.

However, the ADA requires a disabled employee to meet his employer half-way. *Bultemeyer*, 100 F.3d at 1285. Although Excel's policy was to restrict plant access to permanently restricted employees, these employees could receive special permission to gain entrance to the plant. Businesses have relevant concerns regarding the access to its facilities, not the least of which is the safety of its entrants. Plaintiffs have offered no evidence to show that it was Excel's policy to deny access to the plant to permanently restricted employees who sought entrance in order to gain information regarding vacant positions.

Although there may have been vacant positions available while Plaintiffs were permanently restricted, until a permanently restricted employee applies for and is refused a

vacant position because of his disability, a suit complaining about the refusal to give the applicant the position is premature. *Miller*, 107 F.3d at 486. Moreover, while there may have been erroneous and/or inconsistent dealings between permanently restricted employees and Excel, the Court cannot say that Excel maintained any policy, practice, or procedure contrary to the ADA which violated Plaintiffs' rights as a class.

Accordingly, the Court finds that Excel's job matching process adequately fulfilled its requirement under the Americans with Disabilities Act to engage in an interactive process with Plaintiffs in order to determine the availability of any reasonable accommodations.

### D. *PHYSICAL FITNESS REQUIREMENT*

■ Finally, Plaintiffs argue that the "physical fitness" requirement contained within the seniority provision of the CBA violated the ADA. Plaintiffs assert that said requirement acted as a screening device to discriminate against the disabled in favor of the more physically fit/able. Plaintiffs claim that the physical fitness requirement was a blanket policy provision on the awarding of available jobs which precluded an individualized assessment as required by the ADA. Therefore, the provision is a *per se* violation of the ADA.

Excel argues that the phrase should be given its everyday meaning and is not synonymous with "disability free." Moreover, Excel asserts that Plaintiffs have offered no evidence that the term "physical fitness" has been used to deny any employee a vacant position. Finally, Excel states that contrary to Plaintiffs' assertion, the provision is not a blanket policy provision and that its policies foster individualized assessments in awarding vacant positions.

Article XIII, § 1(B) of Excel's Collective Bargaining Agreement with the Union provides that "[l]ayoff, recall and promotion will be based on length of service within a department or the plant provided the qualifications, ability to perform the work and physical fitness are equal among employees eligible for consideration." Contrary to Plaintiffs' assertions, the Court finds that the CBA's physical fitness requirement is

not a separate job requirement and does not create a blanket policy provision used to screen out disabled employees from vacant positions. Rather, in the context of the CBA, the physical fitness requirement refers to the employee's physical fitness to perform the essential functions of the vacant position.

The ADA does not require an employer to provide a disabled employee with a job for which the disabled employee is otherwise unqualified. *Gile*, 95 F.3d at 499; *White*, 45 F.3d at 362. If a job involves manual labor, physical fitness is generally considered an essential function of the job. For example, "[t]he manifest job-relatedness of a requirement that a manual laborer have a good back is bolstered by the frequency with which physical fitness requirements generally have been found to be valid." *Smith v. Olin Chemical Corp.*, 555 F.2d 1283, 1288 (5th Cir.1977) (race discrimination). "Some courts have brushed aside claims of discrimination noting the manifest connection between physical fitness and job performance." *Id.* at 1288 n. 6 (citations omitted). Moreover, at least one court has found that job-related physical fitness requirements are valid evaluation factors in a claim of age discrimination. *Massarsky v. General Motors Corp.*, 706 F.2d 111, 132 (3rd Cir.1983).

In the instant case, Excel's production jobs consist of strenuous manual labor. Thus, an employee's physical fitness is a job-related concern/factor. When the seniority provision of the CBA is read as a whole, it is clear that the physical fitness requirement is not a separate screening mechanism but is simply stressing the fact that in order to be awarded a vacant position, the applicant must have seniority and the physical fitness which enables him to perform the essential functions of the job.

Furthermore, the Court does not see the physical fitness requirement as a blanket policy provision.[14] Rather, as the Court's prior analysis shows, when awarding vacant posi-tions, Excel engaged in an individualized assessment of the applicant's needs, physical capabilities to perform the essential functions of the position, and any available reasonable accommodation.

Accordingly, the Court finds that the physical fitness requirement contained within the seniority provision of Excel's Collective Bargaining Agreement with the Union did not violate the Americans with Disabilities Act.

## V. CONCLUSION

*Ergo*, Excel's Motion for Summary Judgment is ALLOWED, and Plaintiffs' Motion for Partial Summary Judgment is DENIED. Accordingly, judgment is hereby entered in favor of Excel and against Plaintiffs. Each party is to bear their own costs.

CASE CLOSED.

---

14. In the cases relied upon by Plaintiffs (*Hammer v. Bd. of Educ. of Arlington Heights Sch. Dist. No. 25*, 955 F.Supp. 921 (N.D.Ill.1997); *Stillwell v. Kansas City, Missouri, Bd. of Police Comm'rs*, 872 F.Supp. 682 (W.D.Mo.1995); *Hutchinson v. United Parcel Serv.*, 883 F.Supp. 379 (N.D.Iowa 1995); and *Bombrys v. City of Toledo*, 849 F.Supp. 1210 (N.D.Ohio 1993)), the district courts held that blanket policy provisions which did not consider disabled employees' individual factors violated the ADA. Because the physical fitness requirement here is not a blanket policy provision, these cases are easily distinguishable.