**Brenda S. RENNIE, Plaintiff,**

v.

**UNITED PARCEL SERVICE, Defendant.**

**No. Civ.A.99–10869–RBC.**[1]

United States District Court, D. Massachusetts.

May 10, 2001.

---

1. Both parties consented to the exercise of jurisdiction by a United States Magistrate Judge (# 32, # 35).

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (# 40)

COLLINGS, Chief United States Magistrate Judge.

### I. Introduction

Plaintiff Brenda S. Rennie ("Rennie" or the "Plaintiff") filed a three count complaint against the defendant United Parcel Service ("UPS" or the "Defendant") alleging that UPS discriminated against her based on her disability. The basis of Rennie's case is that UPS discriminated against her when she applied for a position as a package unloader based on the fact that she is deaf. Rennie asserts that UPS failed to reasonably accommodate her disability by failing to provide her with a qualified interpreter during the three day orientation period.

Defendant has filed a motion for summary judgment on all three counts of Plaintiff's complaint (# 40) and a supporting memorandum of law with a statement of undisputed facts and an appendix of exhibits (# 41, 42). In response, Plaintiff submitted an opposition to the motion (# 43) and a statement of material facts in dispute with exhibits (# 44). Defendant then filed a reply memorandum to Plaintiff's opposition to Defendant's motion for summary judgment (# 45). For the reasons stated below, Defendant's motion for summary judgment will be allowed.

### II. The Facts

Plaintiff Rennie is a thirty-four year old woman who is deaf. (Notice of Removal

(Complaint) # 1, ¶ 1). On or about February 4, 1997, Rennie went to the UPS Human Resources Office in Chelmsford, Massachusetts with her friend, Barbara Sullivan ("Sullivan"), in order to fill out an employment application. (# 1, ¶ 4). Sullivan is a hearing person who knows American Sign Language ("ASL") and often acts as an interpreter for Rennie. (*Id.*).

On that same day, February 4, 1997, Rennie, accompanied by Sullivan, toured UPS's facility, and after the tour, Rennie was interviewed by UPS personnel. (Defendant's Statement of Material Facts Not in Dispute # 41, ¶¶ 3, 4)[2]. Shortly thereafter, UPS hired Rennie as a package unloader. (# 41, ¶ 4). While in the UPS Human Resources Office on February 4, Rennie asked a UPS employee who was present whether she could use Sullivan as an interpreter for the orientation process. (Plaintiff's Statement of Material Facts in Dispute # 44, ¶ 4). The UPS employee told Rennie that she could not use Sullivan as an interpreter because UPS had a contract with the Massachusetts Commission for the Deaf and Hard of Hearing ("MCDHH") and that UPS would arrange to have an interpreter at the orientation for Rennie. (# 1, ¶ 6; # 44, ¶ 4 and # 44, Exhibit 1, Vol. 1, pp. 78–79).

Rennie was scheduled to begin orientation at the Chelmsford UPS facility on March 10, 1997. (# 1, ¶ 7). Prior to March 10, 1997, she paged Lisa Crider ("Crider"), a UPS employee, to confirm that there would be an interpreter at the orientation; Crider informed Rennie that an interpreter would be present at the orientation on March 10, 1997. (# 1, ¶ 8).

Renay Martin ("Martin"), an Employee Relations Supervisor for UPS, was responsible for the orientation of Rennie. (# 41,

¶ 5). Martin asked John Williams ("Williams"), a deaf UPS employee who worked as an unloader, to assist with Rennie's orientation. (# 41, ¶ 8). Orientation for an unloader consisted of classroom training and hands-on training regarding the handling of packages. (# 41, ¶ 9). In preparing for Rennie's orientation, Martin met with Williams for approximately 15 minutes to a half an hour to review the topics that were going to be covered. (# 41, ¶ 11; # 44, ¶ 11). Some time after Martin's meeting with Williams, Crider contacted Rennie and informed her that there would be an interpreter present at the orientation. (# 44, ¶ 11). Martin arranged for Rennie to undergo a three day orientation while all of the other people hired as unloaders undergo a four day orientation. (*Id.*). The stated rationale for this discrepancy is that because Rennie was hired for an "unload" position, she would not need to learn how to use a scanning device for the "load" position. (*Id.; # 44, Ex. 3, p. 69*).[3]

On March 10, at approximately 12:30 p.m., Martin met Rennie at UPS's entrance gate and escorted her to the orientation room, where she introduced Rennie to Williams. (# 41, ¶ 12). Before introducing Rennie to Williams, Martin gave Rennie a note explaining that she would meet with Williams who would assist in communicating with her and who was able to sign. (# 44, ¶ 12). In addition to the written materials provided to all new employees, Martin provided Rennie and Williams with her own personal written notes of what she would cover in the orientation and made herself available to assist Rennie throughout the orientation. (# 41, ¶ 13). At first, it appeared to Martin that Rennie and

---

2. Citations to the Undisputed Facts are to the paragraph, rather than to the underlying exhibit. Where there is a dispute of fact, citations are to the underlying exhibit.

3. It is unclear from the record, but it appears that on the fourth day of orientation, training is given on how to use a scanner, a device used by loaders but not used by unloaders.

Williams were having no trouble communicating. (# 41, ¶ 14).

The orientation began with a videotape about safety that was not closed-captioned and that neither Rennie nor Williams could understand. (# 44, ¶ 15). About 15 minutes into the orientation, Rennie was asked to complete an I–9 employment form. (# 41, ¶ 16). Rennie incorrectly filled out the I–9 form, so Martin asked Rennie to complete another I–9 form and offered to assist her in doing so. (# 41, ¶ 17). Rennie then became upset and said that she was having difficulty communicating with Williams. (# 41, ¶ 18). Rennie realized that Williams' signing skills were low and that she used a different style of sign language from Williams. (# 1, ¶ 11)[4]. She also realized that Williams did not have the ability to understand and communicate the orientation materials to her effectively because he, like Rennie, could not hear the presentation. (*Id.*).

Rennie repeatedly tried to assert her rights to an interpreter under the Americans with Disabilities Act (the "ADA") and became infuriated with the situation when Martin refused. (# 44, ¶ 19). Instead, Martin insisted that she and Rennie write notes back and forth which Rennie stated was not effective for her. (*Id.*).

Rennie told Martin that she was going to speak with an attorney about the incident and again asserted her right to an interpreter under the ADA. (# 1, 16; # 41, ¶ 20; # 44, ¶ 20). Shortly thereafter, Rennie left the UPS facility. (*Id.*). Before Rennie left, Martin told her that she was welcome to have her friend, Barbara Sullivan, attend that evening's orientation and interpret for her; Rennie responded that she did not know if Sullivan was available. (# 41, ¶ 21; # 44, ¶ 21). Later that day,

Martin received a call informing her that Sullivan was not available to act as an interpreter that evening. (# 41, ¶ 23).

Upon learning that Sullivan would not be attending the orientation with Rennie, Martin called the MCDHH and spoke with Scott LeSaffre ("LeSaffre") about retaining an interpreter for Rennie (# 41, ¶ 25). On that same day, Martin had a conversation with UPS's Employment Manager, Christopher McNeil ("McNeil"), in which McNeil suggested that they try to get Rennie to bring in Sullivan as an interpreter but told Martin that they would not pay Sullivan for her services. (# 44, ¶ 25). Martin requested interpreters for the following week's orientation, March 17–19, however, Martin requested interpreters from the MCDHH only for the classroom portions of the orientation, not for the hands-on portions of the orientation which took place at the trucks. (# 41, ¶ 26; # 44, ¶ 26 and # 44, Ex. 3, pp. 100–103). LeSaffre informed Martin that the MCDHH has a policy that it needs at least two weeks notice for requests for interpreters, but stated that he would work on the request. (# 44, ¶ 27 and # 44, Ex. 8, p. 26). Martin then called Rennie and informed her that she had requested an interpreter from the MCDHH for the March 17–19 orientation. (# 41, ¶ 26)[5].

The MCDHH is the only referral agency for sign language interpreters in Massachusetts. (# 41, ¶ 28). All of the interpreters referred by the MCDHH are certified in ASL and thus are able to interpret receptively and projectively in ASL. (# 44, ¶ 29). Even with 180 registered interpreters, the MCDHH cannot satisfy all of the requests it receives. (# 41, ¶ 31).

On March 14, LeSaffre called Martin and told her that her request for an inter-

4. Apparently, there are two different types of sign language—ASL and another type in which words are spelled out. (# 44, Ex. 1, Vol.1, p. 95).

5. Rennie is able to participate in telephone calls with the assistance of a TTY service. (# 44, Ex. 3, p. 134).

preter was unfilled. (# 44, ¶ 34 and # 44, Ex. 8, p. 26). When LeSaffre informed Martin that her request would be unfilled, Martin requested interpreters for the March 24–26 orientation session. (# 44, ¶ 36). Martin made this request for the March 24–26 session because it was her goal to get Rennie into the "next earliest orientation, which would be the following Monday." (# 44, ¶ 37). Martin then called Rennie and told her that the March 17–19 orientation did not look good and that they might have to reschedule to March 24–26. (# 41, ¶ 36). Martin stated that she would call Rennie back and let her know if the March 17 orientation would go forward. It is unclear whether Martin ever called Rennie back. (# 44, ¶ 38).

The morning of March 17, Rennie called Martin and informed her that she could not attend orientation that day because she had to travel home to be with her mother who was terminally ill. (# 41, ¶ 37). Rennie told Martin that she did not know how long she would be gone and that she would call her when she returned in order to reschedule her orientation. (# 41, ¶ 38). Martin then called the MCDHH and withdrew the request for an interpreter for March 24–26. (# 41, ¶ 39).

During the first week of April, Rennie called Martin and told her that she was again available to participate in an orientation. (# 41, ¶ 40). Thus, on April 3, Martin called the MCDHH and requested an interpreter for April 14–16 for the classroom portions of the orientation. (# 41, ¶ 41; # 44, ¶ 43). As of April 9, the MCDHH had booked an interpreter for April 15 and was working on filling the request for the other two days of scheduled orientation. (# 41, ¶ 42).

On April 9, Rennie called the MCDHH and cancelled UPS's request for an interpreter. (# 41, ¶ 43). Rennie made this call to the MCDHH because she was angry and frustrated about the situation and by the delays in the orientation that resulted from UPS not making timely requests for an interpreter. (# 44, ¶ 45 and # 44, Ex. 1, Vol. 2, pp. 66–68). Rennie canceled the request because she knew from experience that it was unlikely that the MCDHH would be able to fulfill it when they only had scheduled an interpreter for one day of the three day orientation. (*Id.*). Rennie has worked for the MCDHH in the past and was very familiar with the process of obtaining an interpreter and knew that at least two weeks notice was required. (# 44, ¶ 45 and # 44, Ex. 1, Vol. 1, pp. 135–138). Rennie then called Martin and told her that she was no longer interested in working at UPS, stating to Martin that she believed that they were playing a "mouse and cat" game and that she thought it would be best for her not to work at UPS with all of the mix-ups. (# 41, ¶ 44; # 44, ¶ 46 and # 44, Ex. 9). Martin agreed with Rennie that they should end the back and forth. (# 44, ¶ 46).

### III. The Claim

■ Rennie alleges UPS discriminated against her by failing to reasonably accommodate her disability—deafness—by failing to obtain a qualified interpreter for her for the orientation period of her employment, in violation of the ADA (42 U.S.C. § 12102 et seq.), Mass.Gen.L. c. 151B, § 4(16), and Mass.Gen.L. c. 93, § 103.[6]

---

6. The court hereby grants defendant's motion for summary judgment on plaintiff's claim under Mass.Gen.L. c. 93, § 103 (Count III of the Complaint) as that claim is preempted by the claim under Mass.Gen.L. c. 151B (Count II of the Complaint). *See Reidy v. Travelers Insurance Co.,* 928 F.Supp. 98, 106 (D.Mass.,

1996), *aff'd* 107 F.3d 1 (1 Cir., 1997) ("Because M.G.L. c. 151B is the exclusive state law remedy for employment discrimination complaints, it preempts claims brought under M.G.L. c. 93, § 103"). During oral argument on February 1, 2000, plaintiff's counsel con-

*IV. The Summary Judgment Standard*

The summary judgment standard in this Circuit is familiar. When considering the propriety of the entry of summary judgment, the Court must determine whether:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In making this assessment, the Court is to examine the materials presented "in the light most favorable to the nonmoving party and indulge in all inferences in that party's favor." *Moody v. Boston and Maine Corporation,* 921 F.2d 1, 5 (1 Cir., 1990) (citation omitted); *Casas Office Machines Inc. v. Mita Copystar America, Inc.,* 42 F.3d 668, 684 (1 Cir., 1994).

A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a factual dispute is "genuine" the Court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id., see also National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1 Cir., 1995); *Vasapolli v. Rostoff,* 39 F.3d 27, 32 (1 Cir., 1994). In weighing whether a factual dispute is "material" the Court must examine the substantive law of the case, for "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *National*

*Amusements,* 43 F.3d at 735; *Vasapolli,* 39 F.3d at 32.

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings. Rather, as stated by the Supreme Court:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also National Amusements,* 43 F.3d at 735. Moreover,

> [e]ven in cases where elusive concepts such as motive and intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.

*Rivera–Cotto v. Rivera,* 38 F.3d 611, 613 (1 Cir., 1994) *quoting, Medina–Munoz v. R.J. Reynolds Tobacco Company,* 896 F.2d 5, 8 (1 Cir., 1990); *see also Mesnick v. General Electric Company,* 950 F.2d 816, 822 (1 Cir., 1991).

*V. Discussion*

A. The Reasonable Accommodation Claim

■ Rennie has filed claims against UPS pursuant to the ADA and pursuant to Mass.Gen.L. c. 151B. In order to survive UPS's motion for summary judgment, Rennie must "initially present a prima facie case" of employment discrimination. *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1134–35 (8 Cir., 1999), *cert. denied,*

ceded that the Chapter 93 claim was preempted and agreed that plaintiff could thus not

pursue such a claim.

528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999). The general rule is that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The prima facie case for a claim under the ADA and a claim brought pursuant to Mass.Gen.L. c. 151B, § 4(16) are essentially identical. "To state a prima facie case of disability discrimination under the ADA, a plaintiff must prove by a preponderance of the evidence that: (1) he was disabled within the meaning of the Act; (2) he was a qualified individual, i.e., able to perform the essential functions of the position with or without reasonable accommodation; and (3) he was discharged because of his disability." *Ward v. Massachusetts Health Research Institute, Inc.,* 209 F.3d 29, 33 (1 Cir., 2000) (footnotes omitted). Similarly,

> [t]o establish a prima facie case of unlawful employment discrimination on the basis of handicap under G.L. c. 151B, § 4(16), a plaintiff must present credible evidence that (1) he is handicapped within the meaning of the statute; (2) he is qualified to perform the essential functions of the job with or without reasonable accommodation; (3) he was terminated or otherwise subject to an adverse action by his employer; and (4) the position he had occupied remained open and the employer sought to fill it.

*Dartt v. Browning–Ferris Industries, Inc.,* 427 Mass. 1, 2, 691 N.E.2d 526, 528 (1998).

Although the federal and state statutes do not contain identical wording, the court will proceed to treat the claims under the ADA and c. 151B as one as the "Supreme Judicial Court of Massachusetts has indicated that federal case law construing the ADA should be followed in interpreting the Massachusetts disability law." *Ward,* 209 F.3d at 33, n. 2.; *see also Cormier v. Littlefield,* 13 F.Supp.2d 127, 129 (D.Mass., 1998) ("The standards under the DA, the Rehabilitation Act and Chapter 151B are substantially similar and will, therefore, be treated together for the purposes of [a] pending motion [to dismiss].");  *Pollini v. Raytheon Co.,* No. 97–CV–12229, 1999 WL 681675, *5 n. 2 (D.Mass., July 14, 1999) ("the standards for recovery for both the state law [claims under c. 151B, § 4(16) ] and the ADA are virtually identical.... [A]ny claim based on the ADA would fail for the same reasons as [a] state law claim.").

There are two general types of employment discrimination claims—claims involving discriminatory discharge and claims concerning the failure to reasonably accommodate a disability. The instant case is clearly a reasonable accommodation case, not a discriminatory discharge case. That is, Rennie claims that UPS failed to reasonably accommodate her disability by not obtaining a qualified interpreter for her for the orientation process after she repeatedly requested one. Additionally, Rennie claims that she should have been provided with an interpreter for all parts of the orientation, not just the classroom portions and that she should have been scheduled for four days of orientation, not three. Rennie asserts no claim that UPS fired her based on her disability. Moreover, Rennie makes no claim that she was constructively discharged.

■    The prima facie case for a reasonable accommodation claim under the ADA varies slightly from the general disability discrimination claim. Specifically, in order to state a claim for failure to reasonably accommodate under the ADA and to survive a motion for summary judgment:

> a plaintiff ordinarily must furnish significantly probative evidence that he is a qualified individual with a disability . . .;

that he works (or worked) for an employer whom the ADA covered; that the employer, despite knowing of the employee's physical or mental limitations, did not reasonably accommodate those limitations; and that the employer's failure to do so affected the terms, conditions, or privileges of the plaintiff's employment.[7]

*Ladenheim v. American Airlines, Inc.*, 115 F.Supp.2d 225, 228 (D.P.R., 2000) (citing *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1 Cir., 1999)).

1. *Is Rennie a qualified individual with a disability?*

■ There is little dispute that Rennie is a qualified individual with a disability under the terms of the ADA and M.G.L. c. 151B. Indeed, UPS raises no argument that Rennie is not such a "qualified individual." Under the ADA, a qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). An essential function "is a fundamental job duty of the employment

position." *Ward*, 209 F.3d at 34. It is clear here that with reasonable accommodation, Rennie could have performed the essential functions of the unloader position. That is, she could have unloaded packages from the UPS trucks.

As there is no dispute as to Rennie's status as a qualified individual, the court must determine whether Rennie is disabled. Here again, UPS puts forth no argument that Rennie is not disabled. To prove that she is disabled, Rennie must "adduce evidence demonstrating that she has a 'physical or mental impairment that substantially limits one or more of [her] major life activities....'" *Santiago Clemente v. Executive Airlines, Inc.*, 213 F.3d 25, 30 (1 Cir., 2000) (quoting 42 U.S.C. § 12102(2)(A)). A physical or mental impairment includes "such contagious and noncontagious diseases and conditions as ... speech and hearing impairments...." 28 C.F.R. § 35.104. Obviously then, Rennie's deafness must be considered a physical impairment. Moreover, it is likely that her deafness substantially limits some of her major life activities, including working.[8] UPS has not argued otherwise.

---

**7.** "Once a plaintiff has created a genuine issue of material fact as to each of [the] four steps, a defendant's motion for summary judgment will be denied, unless the defendant can show that the plaintiff's proposed accommodation would create an undue hardship for the defendant's business." *Ladenheim*, 115 F.Supp.2d at 229. In the instant case, UPS has not raised the issue of undue hardship. Thus, the court focuses solely on the four-step inquiry.

A reasonable accommodation claim is *not* subject to the McDonnell Douglas burden-shifting approach which applies to discriminatory discharge claims. *Ladenheim*, 115 F.Supp.2d at 228; *see also Higgins*, 194 F.3d at 264 ("the McDonnell Douglas scheme is inapposite in respect to" reasonable accommodation claims .). Under the *McDonnell Douglas* scheme, the plaintiff must initially present a prima facie case, then the burden of

production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. If defendant is able to articulate such a reason, the burden shifts to the plaintiff to present evidence that the defendant's reason was pretextual. *See generally Kiel, supra.*, 169 F.3d 1131.

**8.** As UPS does not contend that Rennie's deafness does not substantially limit one or more of her major life activities, the court will not engage in a full-scale analysis of which of her life activities is impaired. Suffice it to say that, at the very least, under the Supreme Court's definition, Rennie's ability to work is substantially limited in that she is "significantly restricted in the ability to perform ... a broad range of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491–92, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). The list of jobs that Rennie, by virtue of her deafness, would not be able to perform is self-evident.

Thus, in sum, Rennie is a qualified individual with a disability. Rennie therefore has succesfully established the first element of her prima facie case of discrimination.

### 2. *Is UPS covered by the ADA?*

The parties do not dispute that UPS is a covered entity under the ADA. Indeed, UPS is clearly covered by the ADA because the "ADA requirements apply to employers who employ 15 or more employees." 42 U.S.C. § 12111(5)(A). UPS employs more than 15 people and is thus covered by the ADA.

### 3. *Did UPS reasonably accommodate Rennie?*

This inquiry is the heart of Rennie's case. "Summary judgment is appropriate ... only if a reasonable jury must conclude that the employer has provided reasonable accommodations." *Merry v. A. Sulka & Co., Ltd.,* 953 F.Supp. 922, 927 (N.D.Ill., 1997). There is no question that in the instant case Rennie made a request for a specific accommodation. Specifically, when she felt that Williams was unable to provide her with satisfactory interpretation services, she requested that Martin obtain for her an interpreter who was fluent in ASL. Martin proceeded to attempt to do so by contacting the MCDHH. Moreover, there seems to be little dispute that had UPS provided Rennie with an interpreter who was fluent in ASL for the orientation process (the classroom and hands-on portions), then Rennie would have been reasonably accommodated. The relevant issue is whether UPS's unfulfilled attempts to obtain an interpreter for Rennie for only the classroom portions of the orientation process constituted a reasonable accommodation. The companion issue, which is addressed more fully in Section V.B of this Opinion, *infra,* is whether Rennie, by resigning from her position at UPS, prevented UPS from completing its efforts to reasonably accommodate her.

There is much dispute between the parties as to whether UPS reasonably accommodated Rennie up to the point at which she resigned. Rennie argues that UPS should have known that the MCDHH requires that requests for interpreters be made at least two weeks ahead of time and that she felt as though UPS was playing a "mouse and cat" game with her by rescheduling her orientation repeatedly when UPS was unable to obtain an interpreter. UPS, on the other hand, argues that it was anxious to get Rennie on the payroll, that it made numerous attempts to obtain a satisfactory interpreter from the MCDHH, that it did not know that the MCDHH required a two week window for scheduling interpreters and that Rennie was aware of this fact and should have so informed UPS.

It is not surprising that numerous questions abound regarding whether UPS reasonably accommodated Rennie. "One of the most difficult questions under the ADA has been the definition of what constitutes a reasonable accommodation." Sam Silverman, *The ADA Interactive Process: The Employer and Employee's Duty to Work Together to Identify a Reasonable Accommodation is More Than a Game of Five Card Stud,* 28 Neb.L.Rev. 281, 282 (1998). And, indeed, whether UPS acted reasonably in its accommodation of Rennie is a question of fact precluding summary judgment. "Cases involving reasonable accommodation turn heavily upon their facts and an appraisal of the reasonableness of the parties' behavior." *Jacques v. Clean–Up Group, Inc.,* 96 F.3d 506, 515 (1 Cir., 1996); *see also Ladenheim,* 115 F.Supp.2d at 231, n. 6. ("The issue of the reasonableness of a proposed accommodation is normally a question of fact."); *Hansen v. Runyon,* No. 97 C 3672, 1999 WL 311693, *5 (N.D.Ill., May 13, 1999) (denying defendant's motion for summary

judgment because there was "conflicting evidence regarding the availability and reasonableness of an accommodation."); *Hurley–Bardige v. Brown*, 900 F.Supp. 567, 572 (D.Mass., 1995) (denying defendant's motion for summary judgment because genuine issues of material fact existed as to "whether the accommodations provided by the [defendant] were made in a timely manner."); *Merry*, 953 F.Supp. at 927 ("Ultimately whether an employer's accommodations are judged reasonable turns on whether the employer has made a good faith effort to assess the employee's needs and to respond to them.... This determination involves the careful resolution of issues of fact."); *Feliberty, M.D. v. Kemper Corp.*, 98 F.3d 274, 280 (7 Cir., 1996) ("Reasonableness does not depend solely on effectiveness or timeliness; in some circumstances, an accommodation can be reasonable even if it does not work as well as expected or if it takes time to take effect.").

In addition, determining whether a party acted reasonably requires an assessment of whether that party acted in good faith, an issue of fact. Both parties, not just the employer, are required to engage in the reasonable accommodation process and to act in good faith. The "determination of a reasonable accommodation is a cooperative process in which both the employer and the employee must make reasonable efforts and exercise good faith...." *Feliberty*, 98 F.3d at 280. That is, "under the ADA, the appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability." 29 C.F.R. pt. 1630 App. § 1630.9 (1997).

There are numerous questions of fact as to whether UPS and Rennie acted in good faith during the "interactive" accommodation process up to the point at which Rennie resigned. It can be argued that neither party is without responsibility. For example, should UPS have scheduled an interpreter for a month or more in advance in order to ensure that a qualified interpreter would be available? Should Rennie have informed UPS that the MCDHH requires that an interpreter be requested at least two weeks in advance since she was privy to this information? Should UPS, as Rennie claims, have called Rennie more frequently to keep her abreast of the developments regarding obtaining an interpreter? Should UPS have agreed to pay Sullivan to be an interpreter for Rennie when it became apparent that it was difficult to quickly obtain an interpreter from the MCDHH? Should Rennie have insisted on using Sullivan as an interpreter when it became clear that there were delays in getting an interpreter from the MCDHH? Did UPS intentionally forestall the process by requesting interpreters less than two weeks in advance?

A reasonable jury could find that either UPS or Rennie (or both) failed to act in good faith during the interactive process up to the point of Rennie's resignation. In making determinations about reasonable accommodation, factfinders "should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith." 77 Neb.L.Rev. at 290 (citing *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7 Cir., 1996)); *see also Davidson v. Liberty Mut. Ins. Co.*, 998 F.Supp. 1, 6 (D.Me., 1998) (denying employer's motion for summary judgment on grounds that there were issues of fact as to whether employer "engaged in a good faith attempt to accommodate plaintiff's

disability."); *Selected Labor & Employment Updates*, 3 U.Pa.J.Lab. & Employment L. 355, 357 (2001) ("an employer can't prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process.").

The list above demonstrates that in the case at bar, there are many genuine issues of material fact as to whether the parties acted in good faith during the interactive accommodation process up to the point at which Rennie quit. Thus, the Court must move on to analyze the fourth prong of her prima facie case.

4. *Did UPS's failure to reasonably accommodate Rennie affect the terms, conditions or privileges of her employment?*

■ Although there are many genuine issues of fact as to whether UPS reasonably accommodated Rennie, Rennie must still put forth sufficient evidence regarding the fourth prong of her prima facie case— that UPS's failure to accommodate her affected the terms, conditions or privileges of her employment. It is axiomatic that a plaintiff cannot withstand a motion for summary judgment if she is unable to present some credible evidence on each of the elements of her claim with respect to which she has the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Thus, in order to defeat UPS's motion for summary judgment, Rennie must present at least some evidence that UPS's actions or inactions adversely affected the terms of her employment.

In her opposition, however, Rennie does not clearly articulate how the terms, conditions or privileges of her employment were affected by UPS's failure to reasonably accommodate her. Similarly, UPS does not make any argument that the terms of Rennie's employment were *not* affected by UPS's actions. As Rennie is the non-movant, the court must view the facts in the light most favorable to her. The court therefore must determine whether there is anything in the summary judgment record that would allow a reasonable jury to conclude that UPS's failure to provide Rennie with a qualified interpreter for the orientation process before Rennie resigned affected the terms of her employment.

It is well-established that in determining whether an action is adverse [9] necessarily requires a case-by-case inquiry. *Simas v. First Citizens' Federal Credit Union*, 170 F.3d 37, 49 (1 Cir., 1999); *Blackie v. State of Maine*, 75 F.3d 716, 725 (1 Cir., 1996) (citing *Welsh v. Derwinski*, 14 F.3d 85, 86 (1 Cir., 1994)) (same). Prevailing case law in the First Circuit and elsewhere supports a fairly liberal approach in determining what constitutes an adverse employment action. "Demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and toleration of harassment by other employees" can all constitute adverse employment actions. *Wyatt v. City of Boston*, 35 F.3d 13, 15 (1 Cir., 1994); *see also Nelson v. University of Maine System*, 923 F.Supp. 275, 281 n. 6 (D.Me., 1996) ("Courts have found ... that even lateral transfers, without a reduction in pay or benefits can constitute adverse employment action if the employer relocates an employee to an undesirable location in an office."); *Robinson v. Pittsburgh*, 120 F.3d 1286, 1291 (3 Cir., 1997) (stating that conduct is adverse if it results in significant change in employment status or "alters the employee's compensation ... or adversely affects his

---

**9.** Throughout the remainder of this opinion, the phrase "adverse employment action" will be used interchangeably with the phrase "af-
fected the terms, conditions, or privileges of employment."

status as an employee."); *Collins v. State of Ill.*, 830 F.2d 692, 703 (7 Cir., 1987) (holding that adverse employment action is not limited to actions relating to strictly monetary concerns).

Although she does not clearly state it, the gist of Rennie's argument seems to be that UPS denied her a condition of her employment when they repeatedly failed to obtain an interpreter for her, thus making it impossible for her to take part in the orientation process and begin work as an unloader. That is, by forestalling the process of obtaining an interpreter for Rennie, UPS prevented her from becoming trained to do the job she was hired to do, training that the all of the other unloaders received. Moreover, even if UPS had obtained a qualified interpreter for Rennie, as they were attempting to do, it appears that they were only planning to hire the interpreter for the classroom portions of the orientation, thus preventing Rennie from understanding the hands-on portions of the orientation. Again, UPS put Rennie in the untenable position of being an untrained employee, unable to properly fulfill the duties of her position and thus, she was denied a condition of her employment—training to do the job properly. Additionally, there is some indication that UPS treated Rennie differently than its other unloaders by declining to schedule her for a fourth day of orientation during which training would have been given regarding the use of a scanner. Denying Rennie such training may have prevented her from eventually obtaining a promotion or a job change as she would have been less qualified than the other unloaders, having been precluded from learning how to use a scanner. Although this court finds that it is a close call as to whether Rennie was subjected to an adverse employment action, a reasonable jury could find that she was. There is sufficient evidence in the record that UPS denied (or at least delayed) Rennie from receiving necessary training and that UPS prevented Rennie from being trained to use a scanner, training that all other unloaders received.

### B. Rennie's Resignation

Although it is given short shrift in UPS's memorandum, the most serious issue in this case is not whether UPS reasonably accommodated Rennie but whether Rennie effectively precluded UPS from being able to reasonably accommodate her by resigning in April, 1997. There is no question that as of that time, UPS was in the process of attempting to accommodate Rennie's disability. While UPS' efforts at accommodation for the training session beginning March 10th were not successful, UPS did thereafter try to arrange for a qualified interpreter for the session beginning March 17th. While it did not look like an interpreter would be available on March 17th, UPS was hopeful and planned to schedule Rennie for the session beginning March 24th if no interpreter became available on for March 17th. However, because of a family emergency, Rennie informed UPS that she could not attend on March 17th and would let UPS know when she was again available.

It was when Rennie called back during the first week in April that UPS scheduled her for the session beginning April 14th. As of April 9th, an interpreter had been scheduled for April 15th and the agency was working on getting ones for April 14th and April 16th. Nevertheless, Rennie herself cancelled the interpreter for April 15th and called UPS to say she was not interested in becoming their employee. In short, after March 10th, UPS had only one chance to get an interpreter for a training session which Rennie could attend and that was the session beginning April 14th. Further, on the record submitted to me, there is nothing to indicate that Rennie ever indicated to UPS that she wanted the

fourth day of training, or that she specifically wanted an interpreter for the hands-on training.[10]

A recent Fifth Circuit case, *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731 (5 Cir., 1999), addresses the issue of whether an employee effectively prevents her employer from reasonably accommodating her by voluntarily resigning from her position before the accommodation occurs. In *Loulseged*, the plaintiff employee was employed as a laboratory technician. Part of her duties were to transport heavy containers of chemicals every eight or nine weeks, on a rotating basis with other employees. After several months of employment, plaintiff injured her back while moving a waste container. The defendant employer made several modifications to plaintiff's job in order to accommodate her back injury, including providing her with a stool and allowing her to use outside contract workers to assist her in carrying the chemical containers. Several years later, plaintiff took leave to have back surgery. When she returned, her medical restrictions had been expanded and the defendant again accommodated her.

A year or so later, the defendant decided to eliminate the use of the contract workers to help transport the chemicals. Plaintiff's supervisor told her that this circumstance applied to her as well as to the rest of the employees. At no point did her supervisor indicate the conditions under which plaintiff would be expected to complete her transport rotation. At a meeting of the laboratory technicians which plaintiff attended, there was discussion of using a tricycle for transporting the chemical containers. Plaintiff remained silent at the meeting and never spoke to anyone about her disability accommodation thereafter. One week before her rotational transport duties were scheduled to occur again, plaintiff resigned.

The *Loulseged* plaintiff then sued defendant for discrimination under the ADA alleging that defendant failed to reasonably accommodate her disability. After a trial, the court granted defendant's motion for judgment as a matter of law. The *Loulseged* court's rationale for granting defendant's motion was that there was a breakdown in the interactive process designed to bring about the reasonable accommodation and that the plaintiff, not the defendant, was responsible for this breakdown in communication.[11] The court stated, in relevant part, that:

It is difficult to judge the reasonableness of accommodations when the employee withdraws before we can say with any authority what these accommodations would have been. In an ordinary case of this sort, the finality of an accommodation can usually be presumed—generally because the employer took some concrete adverse employment action such as terminating the employee (or refusing to hire the applicant for employment), which emphatically signals that no further accommodations will be made. In this case, however, the employee quit.... Had she not quit, [defendant] might have provided [plaintiff] with a squadron of Olympic weightlifters

---

10. Not only is there nothing in the record submitted by counsel to indicates that Rennie ever mentioned these two issues to UPS, the Court has reviewed those portions of the depositions of Rennie and Renay Martin not originally submitted by counsel in connection with the motion for summary judgment, and, again, there is nothing to indicate that Rennie ever mentioned these two issues to UPS.

11. In essence, the court found that plaintiff could not sufficiently prove the third prong of her discrimination case—that defendant failed to reasonably accommodate her—because she prevented defendant from accommodating her when she voluntarily resigned.

and a Mercedes–Benz chemical transport vehicle to aid her in her tasks. It also might have ordered her on pain of termination to move fifty-pound containers unaided. Because of [plaintiff's] decision to quit, we simply cannot know.... What occurred here was not a refusal of [defendant] to reasonably accommodate [plaintiff's] concerns, but a breakdown in the interactive process designed to create those reasonable accommodations.... [Plaintiff] could have simply waited a few days to see whether further proposals or discussions developed. She also could have at several points vocalized her concerns—thus participating in the informal interactive process—and in the process given [defendant] a chance to correct her misperception that further discussion was futile. Instead, she chose to quit.

*Loulseged,* 178 F.3d at 734–35, 740.

Moreover, the *Loulseged* court announced that "[n]othing in the [ADA] regulations or in the cases indicates ... that an employer must move with maximum speed to complete [the reasonable accommodation] process and preempt any possible concerns.... [T]he employer is entitled to move at whatever pace he chooses as long as the ultimate problem—the employee's performance of her duties—is not truly imminent." *Id.* at 737. The court ultimately ruled that "no reasonable jury could find [defendant] at fault for the breakdown of the interactive process." *Id.* at 736; *see also Rutlin v. Prime Succession, Inc.,* 75 F.Supp.2d 735, 740 (W.D.Mich., 1999) (in handicap discrimination case, granting summary judgment in favor of defendant on grounds that plaintiff who resigned was unable to present sufficient evidence of adverse employment action).

The parallels between *Loulseged* and the case at bar are striking. Like the plaintiff in *Loulseged,* Rennie voluntarily resigned before UPS had completed its attempts at reasonable accommodations. Certainly, there is a substantial likelihood that had Rennie not resigned, UPS would have eventually obtained a qualified interpreter for her to assist her in the orientation process and that Rennie then would have been able to successfully complete her orientation and gone on to work at UPS. Indeed, there is no evidence to the contrary. From the evidence presented, it appears that UPS was making repeated attempts to work with the MCDHH to retain a suitable interpreter and was anxious to have Rennie begin employment at UPS. It may have been taking UPS longer than Rennie would have liked to obtain the interpreter, but under *Loulseged,* UPS is not required to move with maximum speed. As a result of Rennie's resignation, there simply is no way to determine definitively whether UPS would have reasonably accommodated her or not because Rennie quit before giving UPS the chance to do so.

Moreover, like the plaintiff in *Louselged,* Rennie basically remained silent regarding the accommodations she was seeking from UPS. As explained, *supra,* other than her initial request for an interpreter, she never asked UPS to retain an interpreter for the hands-on portions of the training nor did she ever request a fourth day of orientation. Had Rennie not resigned from her job, UPS might have obtained an interpreter for her for both the classroom and hands-on portions of the orientation and might have scheduled her for a fourth day of training.

In sum, no reasonable jury could find that the interactive process, either as to obtaining a qualified interpreter for the three days of training, including the hands-on portion or providing Rennie with a fourth day of training, had reached an end result when Rennie quit. The act of quit-

ting was, in essence, a complete failure to continue to engage in the interactive process and prevented UPS from making any further attempts to reasonably accommodate her. The end result is that Rennie cannot prove that UPS failed to reasonably accommodate her. On the basis of the holding in *Loulseged* which the Court finds instructive, summary judgment in favor of UPS is appropriate.

### VI. Conclusion and Order

For the aforementioned reasons, it is ordered that the Defendant's Motion For Summary Judgment (# 40) be, and the same hereby, is ALLOWED. Judgment shall enter accordingly.